

**SP+ Corporation**
200 E Randolph St
Suite 7700
Chicago, IL 60601
312-274-2000

spplus.com | parking.com | bagsinc.com

January 3, 2020

Davis Diniz
11761 NW 11th Street
Plantation, FL 33323

Dear Davis:

I am pleased to confirm our offer of promotion to become a Regional Hospitality Manager, subject to the terms and conditions in this letter and the execution of the enclosed Confidentiality and Non-Competition Agreement, a copy of which is attached and made a part of your terms of employment (hereinafter referred to as the "Confidentiality Agreement").

The following is a summary of our offer of promotion:

| | |
|---|---|
| **Position:** | Regional Hospitality Manager, reporting to Dan Brown, effective January 1, 2020. |
| **Compensation:** | **Base Salary:** Your annualized salary will be $145,000 (currently paid on a semi-monthly basis). Base salary is reviewed and potentially adjusted annually based on the company's and individual's performance in the prior year. There is no gas allowance associated with this position. |
| | **Incentive Compensation:** In addition to your base salary you will be eligible to participate in the company's Management Incentive Program for the 2020 plan year. The target bonus opportunity and incentive goals are subject to change annually; the current annual target for your new role is $10,500. Bonuses are paid in March following the performance year (e.g., 2020 bonuses will be paid in March 2021). You must be employed on the date the bonus is paid in order to be eligible. |
| **Health & Welfare and Retirement Plans:** | Your health & welfare benefits will remain the same. The Benefits team will reach out to you about your eligibility for the non-qualified retirement plan. |
| **Cell Phone:** | Per the Smart Phone Reimbursement Policy, you will be reimbursed for up to $75.00 per month for cell phone costs. |
| **Salary Continuation upon termination of employment:** | In the event your employment is terminated by the Company for any other reason than for cause, subject to and conditioned upon your execution of a Confidential Severance Agreement and General Release which shall contain confirmation of your agreement to strictly comply with the Confidentiality Agreement, you will receive base salary continuation payments at the rate in effect the day before your date of termination, for a period not to exceed six (6) months after the date of termination. |

PARKING | TRANSPORTATION | FACILITY MAINTENANCE | EVENT LOGISTICS | BAGS® | CONSULTING

Exhibit 1

January 3, 2020
Page 2

Davis, if you agree to the terms and conditions outlined above, please complete and acknowledge your acceptance by signing this letter and returning to me.

Congratulations on your promotion. Please contact me should you have any questions.

Sincerely,


Thomas L. Hagerman
SVP, Operations

Accepted: _____     01-06-20
                Davis Diniz                              Date

**Exhibit 1**

**SP+**

**AND ITS AFFILIATED ENTITIES**

**AGREEMENT REGARDING CONFIDENTIALITY AND NON-COMPETITION**

Employee understands that Employee is or will be employed by or enter into a relationship with SP Plus Corporation, its affiliates, parent, and/or subsidiaries, as well as any of their respective predecessors, successors and assigns (collectively "the Company"), and will learn and have access to the Company's confidential, trade secret and proprietary information. Employee understands that the products and services that the Company develops, provides and markets are unique. Further, Employee agrees that Employee's promises in this Agreement are an important way for the Company to protect its proprietary interests.

The Company is in the business of providing an array of commercial and residential service related businesses, including, operating private and public parking facilities for itself, its subsidiaries, affiliates and others, and as a consultant and/or manager for parking facilities operated by others throughout the United States and Canada, providing on-street and off-street parking enforcement, maintenance, residential and commercial property management services, security services for commercial establishments and airport and urban transportation services and specialized transportation plans and services for major national and international sporting and special event venues, (the Company and its subsidiaries and affiliates and other Company-controlled businesses engaged in parking garage management (in each case including their predecessor's or successor's) are referred to hereinafter as the "Company").

In the course of Employee's employment hereunder, Employee will have access to highly confidential and proprietary information of the Company and its customers, including without limitation the information referred to in paragraphs 1 and 3 below.

The Company is engaged in a business which is highly specialized, the identity and particular needs of the Company's customers are not generally known, and the documents and information regarding the Company's customers, employees, temporary personnel, services, products, technology, sales techniques, methods of operation, pricing, and costs are highly confidential.

The Employee understands and acknowledges that the Company has expended significant resources over many years to identify, develop, and maintain its customers. The Employee additionally acknowledges that many of the Company's customers have had continuous and long-standing relationships with the Company and that, as a result of these close, long-term relationships, the Company possesses significant knowledge of and confidential information about its customers and their needs. Finally, the Employee acknowledges the Employee's association and contact with these customers is derived solely from Employee's employment with the Company. The Employee further acknowledges that the Company does business throughout the United States and Canada..

The Company and Employee agree these recitals are material terms of this Agreement.

Employee acknowledges that Employee has been given an opportunity to have this Agreement reviewed by an attorney and that Employee is not relying on legal advice provided by the Company or any Company personnel.

In addition to other good and valuable consideration, Employee is expressly being given employment, continued employment, a promotion, a relationship with the Company, certain monies, benefits, training and/or trade secrets and confidential information of the Company and its

**Exhibit 1**

customers, to which Employee would not have access but for Employee's relationship with the Company in exchange for Employee's agreeing to the terms of this Agreement as follows:

1. **Protection of Confidential Information**  Employee will not, without the Company's prior written permission, directly or indirectly utilize for any purpose other than performance of Employee's employment duties for the Company, or disclose to anyone outside of the Company, either during or after Employee's employment with the Company, any confidential information provided to or obtained by Employee in the course of Employee's employment with the Company or trade secrets of the Company, or any information received by the Company in confidence from or about third parties, as long as such matters remain trade secrets or confidential.  Trade secrets and other confidential information shall include any information or material which is not generally known to the public, and which (a) is generated or collected by or utilized in the operations of the Company and relates to the actual or anticipated business or research or development of the Company or the Company's actual or prospective customers; or (b) is suggested by or results from any task assigned to Employee by the Company or work performed by Employee for or on behalf of the Company or any customer of the Company.  Confidential information shall not be considered generally known to the public if revealed improperly to the public by Employee or others without the Company's express written consent and/or in violation of an obligation of confidentiality to the Company.   Examples of confidential information include, but are not limited to, customer, employees and temporary personnel identification and contacts, non-public information about customers, business relationships, contract provisions, pricing, margins, business plans, marketing plans, financial data, business and customer strategy, techniques, models, software, solutions, discussion guides, personal or performance information about employees, research and development, patent applications and plans or proposals related to the foregoing.  The confidentiality obligations herein shall not prohibit Employee from divulging confidential information or trade secrets by order of court or agency of competent jurisdiction or as required by law; however, Employee shall promptly inform the Company of any such situations and shall take reasonable steps to prevent disclosure of confidential information or trade secrets until the Company has been informed of such required disclosure and has had a reasonable opportunity to seek a protective order.

2. **Return of Property and Copying**  Employee agrees that all tangible materials (whether originals or duplicates), including, but not limited to notebooks, computers, files, reports, proposals, price lists, lists of actual or potential customers or suppliers, talent lists, models, specifications, technical data, methodologies, research results, financial data, contracts, agreements, correspondence, documents, computer disks, software, computer printouts, information stored electronically, memoranda, and notes, in Employee's possession or control which in any way relate to the Company's business and which are furnished to Employee by or on behalf of the Company or which are prepared, compiled or acquired by Employee while working with or employed by the Company shall be the sole property of the Company.  Employee will at any time upon the request of the Company and in any event promptly upon termination of Employee's employment with the Company, but in any event no later than two (2) business days after such termination, deliver all such materials to the Company and will not retain any originals or copies of such materials.  Except to the extent approved by the Company or required by Employee's bona fide job duties for the Company, Employee also agrees that Employee will not copy or remove from the Company's place of business or the place of business of a customer of the Company property or information belonging to the Company or a customer or entrusted to the Company or a customer.  In addition, Employee agrees that Employee will not provide any such materials to any competitor of the Company unless specifically required by Employee's bona fide job duties for the Company.

3. **Protection of Proprietary Interests**

    (a) Employee agrees that during Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or

2

Exhibit 1

any other person, company or entity, solicit or participate in soliciting any person, company or entity for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company or entity was a customer or potential customer of the Company for such products or services with which Employee had direct contact or about which Employee learned confidential information related to such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company.

(b) Employee agrees that during Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which Employee had direct contact regarding such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company.

(c) Employee agrees that during Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not directly or indirectly, on behalf of Employee or in conjunction with any other person, company or entity, own (other than 5% ownership in a publicly traded the Company), manage, operate, or participate in the ownership, management, operation, or control of, or be employed by any entity which is in competition with the Company within a 75 mile radius of any of the Company offices from which Employee worked during the 12 months preceding the termination of Employee's employment with the Company.

(d) Employee agrees that during Employee's employment with the Company and for a period of 12 months thereafter, Employee will not, nor will Employee assist any third party to, directly or indirectly (i) raid, hire, solicit, or attempt to persuade any employee or temporary employee of the Company or any person who was an employee of the Company during the 12 months preceding the termination of Employee's employment with the Company, who possesses confidential information of the Company, to leave the employ of the Company; (ii) interfere with the performance by any such persons of their duties for the Company; or (iii) communicate with any such persons for the purposes described in items (i) and (ii) in this paragraph.

(e) Employee agrees that during Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, utilize or reveal the identity of or contract or relationship terms with any customer, employee or temporary personnel used by or served by the Company at any time during the 12 months preceding the termination of Employee's employment with the Company.

(f) Employee agrees that during Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, become employed or engaged by or affiliated with any person, company or entity that was a customer of the Company during the 12 months preceding the termination of Employee's employment with the Company, in any capacity in which Employee would provide products, services or support competitive with or similar to the products, services, or support offered by, performed by, developed by or created by Employee for the Company during the 12 months preceding the termination of Employee's employment with the Company.

(g) Employee agrees that nothing in this Section 3 shall limit Employee's obligations under Section 1 of this Agreement.

3

**Exhibit 1**

4.    **Best Efforts** Employee agrees that during Employee's employment with the Company, Employee will devote Employee's best efforts to the performance of Employee's duties and the advancement of the Company and shall not engage in any other employment, profitable activities, or other pursuits which would cause Employee to utilize or disclose the Company's confidential information or trade secrets, or reflect adversely on the Company.  This obligation shall include, but is not limited to, obtaining the Company's consent prior to performing tasks for customers of the Company outside of Employee's customary duties for the Company, giving speeches or writing articles about the business of the Company, improperly using the name of the Company, or identifying Employee's association or position with the Company in a manner that reflects unfavorably upon the Company.

5.    **Certification**  Employee agrees not to disclose to the Company, or use in Employee's work for the Company, any confidential information and/or trade secrets belonging to others, including without limitation, Employee's prior employers, or any prior inventions made by Employee and which the Company is not otherwise legally entitled to learn of or use.  Furthermore, by executing this Agreement, Employee certifies that Employee is not subject to any restrictive covenants and/or obligations that would prevent Employee from fully performing Employee's duties for the Company.  Employee also agree that the Company may contact any employer or prospective employer of Employee to inform them of Employee's obligations under this Agreement and that Employee shall affirmatively provide this Agreement to all subsequent employers.

6.    **Choice of Law, Jurisdiction, Injunctive Relief and Attorney's Fees** Employee consents to the law of Illinois being applied to any matter arising out of or relating to this Agreement, without regard to its conflict of law principles.  Further, Employee agrees and consents to the exclusive jurisdiction for any matter arising out of this Agreement or interpreting this Agreement in the state and federal courts of Chicago, Illinois.  In the event of a breach or a threatened breach of this Agreement, by Employee, Employee acknowledges that the Company will face irreparable injury which may be difficult to calculate in dollar terms and that the Company shall be entitled to, in addition to remedies otherwise available at law or in equity, temporary restraining orders and preliminary injunctions and final injunctions without the posting of a bond enjoining such breach or threatened breach.  Should the Company successfully enforce any portion of this Agreement before a trier of fact, the Company shall be entitled to all of its reasonable attorney's fees, expenses and costs incurred as a result of enforcing this Agreement against Employee.

7.    **Amendment, Severability and Merger** Except as set forth in paragraph 9 below, with respect to the subject matter hereof, this Agreement is Employee's entire agreement with the Company, and it supersedes all previous oral or written understandings or agreements, if any, made by or with the Company regarding the same subject matter.  No waiver of any breach of any provision of this Agreement by the Company shall be effective unless it is in writing and no waiver shall be construed to be a waiver of any succeeding breach or as a modification of such provision. The provisions of this Agreement shall be severable and if any provision of this Agreement is found by any court to be unenforceable, in whole or in part, the remainder of this Agreement shall nevertheless be enforceable and binding on the parties. Employee also agrees that a court may modify any invalid, overbroad or unenforceable term of this Agreement so that such term, as modified, is valid and enforceable under applicable law.  Also, Employee agrees that a court may also extend the length of this Agreement for any period of time in which Employee is in breach of this Agreement or as necessary to protect the legitimate business interests of the Company.    Further, Employee affirmatively state that Employee has not, will not and cannot rely on any representations not expressly made herein.  The terms of this Agreement shall not be amended by Employee or the Company except by the express written consent of the Company and Employee.  The section headings in this Agreement are for convenience of reference and in no way define, limit or affect the meaning of this Agreement.

**Exhibit 1**

8.    **At-Will** Employee acknowledges that nothing in this Agreement is intended to require that Employee continue Employee's employment or relationship with the Company for any particular length of time or to require that the Company continue Employee's employment, relationship or compensation for any particular length of time. Employee agrees that Employee is an at-will employee and can be terminated at any time for any reason. Employee acknowledges that the restrictions and covenants set forth in this Agreement shall survive termination of Employee's relationship with the Company for any reason.

9.    **Acknowledgment of Obligations**  Employee acknowledges that Employee's obligations under this Agreement are in addition to, and do not limit, any and all obligations concerning the same subject matter arising under any applicable law including, without limitation, common law relating to fiduciary duties and common law and statutory law relating to trade secrets.

10.    **Cooperation**  Employee agree to cooperate in the truthful and honest prosecution and/or defense of any third party claim in which the Company may have an interest subject to reasonable limitations concerning time and place, which may include without limitation making Employee available to participate in any proceeding involving the Company, allowing Employee to be interviewed by representatives of the Company, appearing for depositions and testimony without requiring a subpoena, and producing and/or providing any documents or names of other persons with relevant information; provided that, if such services are required after the termination of Employee's employment with the Company, the Company shall provide Employee reasonable compensation for the time actually expended in such endeavors and shall pay Employee's reasonable expenses incurred at the prior and specific request of the Company.

11.    **Non-Disparagement**  Employee agrees that during Employee's employment with the Company and for a period of 12 months thereafter, Employee will not make any statement or criticism which is adverse to the interests of the Company, its customers or its vendors; nor will Employee take any action that may reasonably cause the Company, its customers or its vendors embarrassment, humiliation, or otherwise cause or contribute to the Company, its customers or its vendors being held in disrepute by the public or the Company's customers, vendors or employees.

12.    **Assignability** The rights and/or obligations herein may be assigned by the Company without Employee's consent and shall bind and inure to the benefit of the Company's successors, assigns, and representatives.  If the Company makes any assignment of the rights and/or obligations herein, Employee agrees that this Agreement shall remain binding upon Employee in any event.

13.    **Change of Position** Employee acknowledges and agrees that any change in Employee's position or title with the Company shall not cause this Agreement to terminate and shall not effect any change in Employee's obligations under this Agreement.

14.    **Acceptance** Employee agrees that this Agreement is accepted by Employee through Employee's original or facsimile signature.  Employee further agrees that the Company is deemed to have accepted this Agreement as evidenced by Employee's employment with the Company, the payment of wages or monies to Employee, the provision of benefits to Employee, or by executing this Agreement.

15.    **Binding Effect** This Agreement, and the obligations hereunder, shall be binding upon Employee and Employee's successors, heirs, executors, and representatives.

16.    **Notices.**  Any notice which any party shall be required or shall desire to serve upon the other shall be in writing and shall be delivered personally or sent by registered or certified mail, postage prepaid, or sent by facsimile or prepaid overnight courier, to the parties at the addresses set forth below (or such other addresses as shall be specified by the parties by like notice):

**Exhibit 1**

In the case of Employee to:

Davis Diniz
11761 NW 11th Street
Plantation, FL 33323

In the case of the Company to:

SP Plus Corporation
200 E. Randolph  Suite 7700
Chicago, IL 60601
Attention:  General Counsel

Agreed to by:

_____
Employee Signature

_____
Employee's Printed Name

Date: _____

SP Plus Corporation

By: _____

Date:_____

6

**Exhibit 1**



Beck Reed Riden LLP
155 Federal Street | Suite 1302
Boston | Massachusetts 02110
Tel. (617) 500-8660 | Fax (617) 500-8665
BeckReedRiden.com

Stephen Riden
Direct: (617) 500-8672
sriden@beckreed.com

February 18, 2025

BY EMAIL

Mr. Davis Diniz
11761 NW 11th Street
Plantation, FL 33323
*davisdiniz@live.com*

Re:     Violations of Your Ongoing Obligations to SP Plus Corporation

Dear Mr. Diniz:

This firm has been retained as trade secrets / restrictive covenants counsel to SP Plus Corporation, A Metropolis Company ("SP Plus" or the "Company"). I understand that your employment with SP Plus ended on January 31, 2025 and that you (and at least two other former SP Plus employees, Dan Brown and Kris Horgan) are now employed by Five Diamond Parking, LLC ("Five Diamond"), a direct competitor founded by yet another former SP Plus employee, William Bodenhamer.[1] Furthermore, SP Plus recently learned that you and your former SP Plus colleagues are now reaching out to customers that you directly worked with during your employment at SP Plus to solicit business on behalf of Five Diamond – and that you likely laid the groundwork for such solicitation before you had departed from SP Plus. To make matters worse, SP Plus has also discovered that, in your final weeks at the Company, you sent to your personal email address multiple SP Plus documents, including highly confidential documents concerning customer contacts and pricing. In addition, you sent confidential SP Plus information to Mr. Brown *after* he started working for Five Diamond (or an affiliated entity). The information you downloaded was directly related to your work at SP Plus, and it will be invaluable to you in your work for Mr. Bodenhamer at Five Diamond.

Your misconduct is a flagrant violation of your contractual obligations to SP Plus and applicable statutory and common law. In light of your misconduct, I am writing to determine if this situation can be quickly and amicably resolved, and SP Plus's legitimate business interests protected, absent judicial intervention.

As a threshold matter, for any (1) electronic files obtained during or through your employment with SP Plus or (2) electronic files containing SP Plus's trade secrets or other confidential information – regardless of where such files are stored (including on any of your personal devices, in a Dropbox account, or otherwise) – ***do not open or delete them or otherwise change the metadata associated with them***.

---

[1] While it seems clear that you are working for Mr. Bodenhamer at Five Diamond or an affiliated entity, please inform me immediately if this information is incorrect.

**Exhibit 2**



Davis Diniz
February 18, 2025
Page 2 of 8

While I do not intend, at this juncture, to engage in a lengthy analysis of the claims that SP Plus may have against you or any other potentially responsible parties, please be advised that if the facts are as I understand them, your conduct constitutes, at a minimum, a breach of your contractual obligations and misappropriation of trade secrets.

Briefly, the facts as I understand them are as follows:

### YOUR EMPLOYMENT WITH SP PLUS

You worked for SP Plus and its predecessors for decades until January 31, 2025. Your most recent role for SP Plus was Regional Hospitality Manager in South Florida.

In support of your work for SP Plus, you were given extensive training, entrusted with building and maintaining a significant customer base, and provided with ongoing access to highly sensitive information that is proprietary to the Company, including trade secrets and other confidential information concerning its customers, contract terms, and pricing. Given your tenure and level of responsibility with SP Plus, you have extensive connections with its customers throughout Florida, and deep and broad knowledge about SP Plus's trade secrets and confidential information to which you had access.

In connection with your promotion to the role of Regional Hospitality Manager, you signed an Agreement Regarding Confidentiality and Non-Competition (the "Agreement") on January 6, 2020, a copy of which is enclosed, containing, among other things, reasonable noncompete, customer nonsolicit, employee nonsolicit, and nondisclosure restrictive covenants. You expressly agreed, among other things, to the following noncompete restriction:

> during Employee's employment with the Company, and for a period of 12 months thereafter, ***Employee will not…be employed by any entity which is in competition with the Company within a 75 mile radius of any of the Company offices from which Employee worked during the 12 months preceding the termination of Employee's employment with the Company.***

Agreement, § 3(c) (emphasis added).

You further agreed to customer-focused restrictions, including that

> during the Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, solicit or participate in soliciting any person, company or entity for products and services competitive with or similar to products or services

**Exhibit 2**



Davis Diniz
February 18, 2025
Page 3 of 8

offered by, developed by, designed by or distributed by the Company, if that person, company or entity was a customer or potential customer of the Company for such products or services with which Employee had direct contact or about which Employee learned confidential information related to such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company.

Agreement, § 3(a).

Similarly, you agreed that for 12 months following the termination of your employment, you would not

directly or indirectly, on behalf of Employee or any other person, company or entity, offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services and with which Employee had direct contact regarding such products or services at any time during the 12 months preceding the termination of Employee's employment with the Company.

Agreement, § 3(b).

You also agreed that you would not "directly or indirectly utilize for any purpose other than performance of Employee's employment duties for the Company, or disclose to anyone outside of the Company…any confidential information provided to or obtained by Employee in the course of Employee's employment with the Company or trade secrets of the Company…." Agreement, § 1. You agreed that this obligation continues **"during or after Employee's employment with the Company**." *Id.* (emphasis added).

In addition, you agreed to "at any time upon the request of the Company and in any event promptly upon termination of Employee's employment with the Company, but in any event no later than two (2) business days after such termination, deliver all [Company property, including electronically-stored information,] to the Company and will not retain any originals or copies of such materials." *See* Agreement, § 2.

These restrictions are specifically designed to prevent you from using, disclosing, or otherwise misappropriating trade secrets and other confidential information that you learned through your employment with SP Plus, as well as from trading on SP Plus's customer goodwill for the benefit of its competitors.

As you acknowledged in the Agreement, your failure to comply with these restrictions would result in irreparable harm to SP Plus that cannot be adequately compensated solely by

**Exhibit 2**



Davis Diniz
February 18, 2025
Page 4 of 8

money damages. *See* Agreement, § 6. As such, you agreed that, in addition to other remedies at law or in equity that may be available, SP Plus shall be entitled to a temporary restraining order and/or preliminary injunctive relief to enforce or prevent any violations of such provisions. *See id.*

Please be aware that these contractual obligations are in addition to the rights and protections available to SP Plus under state and federal trade secret laws, including the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and other applicable laws.

## <u>YOUR POST-EMPLOYMENT MISCONDUCT</u>

In January 2025 you submitted your notice of voluntary resignation to SP Plus. When asked about your plans, you informed SP Plus that you had no future employment plans, but that you intended to take time off from work, go to Hawaii in March, and probably make it an extended trip. This information was apparently an attempt to conceal your true post-SP Plus employment plans, as SP Plus has since learned that you are now working for Mr. Bodenhamer at a direct competitor, Five Diamond, in a role nearly identical to the one you held at SP Plus.

Further, not only did SP Plus learn that you had lied about accepting a position with Five Diamond in violation of your noncompete obligation, but it has also discovered that you are violating your other post-employment obligations. Specifically, SP Plus is aware that you informed SP Plus customers on your way out the door that they would be hearing from you in the near future, and that you are now soliciting those very same SP Plus customers on behalf of Five Diamond. Upon information and belief, at least one SP Plus customer has already abruptly canceled its contract with SP Plus and will be working with Five Diamond as a result of your misconduct.

Alarmingly, SP Plus just discovered that in the weeks leading up to your resignation from SP Plus, you transmitted numerous files containing the Company's highly confidential information to your personal email account – information that would be extremely valuable to you in your new role at Five Diamond. Your suspicious email activity, together with your efforts to hide your future employment plans from SP Plus and your outreach to SP Plus customers both before and after your departure from SP Plus, strongly suggests that you intend to disclose and use SP Plus's trade secrets and other confidential information in your new role at SP Plus, if you have not done so already.

Your misconduct puts SP Plus's trade secrets and other confidential information squarely at risk of imminent use and disclosure. This constitutes a violation of applicable trade secrets laws, as well as various other obligations that you owe to SP Plus. For instance, the misappropriation of SP Plus's trade secrets constitutes a violation the Defend Trade Secrets Act, 18 U.S.C. § 1839, which forbids, *inter alia*, the "acquisition of a trade secret of another by a

**Exhibit 2**



Davis Diniz
February 18, 2025
Page 5 of 8

person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret of another without express or implied consent…." If SP Plus is required to file a lawsuit against you based on any misappropriation of its trade secrets, it would seek recovery of multiple damages and its attorneys' fees from you personally.

All such misconduct ***must stop immediately***.

Although SP Plus's investigation into the circumstances of your departure has just begun, in light of the information it has already discovered, you have put SP Plus in the position of needing to promptly determine what steps it will need to take to protect itself and its legitimate business interests from any further harm.

<u>**OPPORTUNITY TO MINIMIZE DAMAGES AND POTENTIALLY AVOID LITIGATION**</u>

At this juncture you have a choice.

SP Plus takes the promises you made in the Agreement and your continuing obligations under the law seriously, and it insists that you **immediately** cease and desist from all ongoing violations of your Agreement and comply with the obligations owed by you to SP Plus under the Agreement and state and federal law. Assuming that SP Plus does not discover that you have engaged in, or are continuing to engage in, additional violations of your contractual or legal obligations, we will work with you to determine if SP Plus can adequately protect its legitimate business interests through an amicable and voluntary resolution.

In this regard, if you wish to explore whether it is possible to avoid litigation, please comply with the following ***by Monday, February 24, 2025 at 5:00 p.m. (Eastern Time)***:

(1)     Cease all work for Five Diamond in any capacity and enter into a standstill agreement while SP Plus investigates this situation and determines whether escalation can be avoided.

(2)     Explain how your role with Five Diamond does not violate your contractual obligations to SP Plus. Include within that explanation your job title, start date, and a detailed description of your role and responsibilities, including the geographic territory and customer base for which you are responsible.

(3)     Return to me all ***physical*** documents, files, information, and other property that belong to SP Plus (including any materials located on external storage devices).

**Exhibit 2**



Davis Diniz
February 18, 2025
Page 6 of 8

(4) For any *electronic* files that you have taken that (a) you obtained during or through your employment with SP Plus or (b) contain SP Plus's trade secrets or other confidential information – regardless of where such files are stored (including on any of your personal devices, in your email, in the cloud, or elsewhere) – identify what files you possess and the nature of any SP Plus information contained in them, and I will coordinate with you for the return of such files and their subsequent forensically sound deletion from your possession, custody, and control. Please note, however, that ***you must not open or delete any of them or otherwise change the metadata associated with them***. Doing so will, among other things, violate your obligations under the law, as set forth below.

(5) Affirm that you have not altered, disposed of, copied, or transferred any of SP Plus's documents, files, information, or other property since receiving this letter.

(6) Provide me with a detailed description of each and every use (other than on behalf of SP Plus during your employment with SP Plus) of SP Plus's trade secrets or other confidential information, including the name of each and every person working in concert with you.

(7) Affirm that you have ceased, and going forward will refrain from (a) using SP Plus's trade secrets and other confidential information, (b) doing business with, trying to do business with, or interfering with SP Plus's current and prospective customers, and, (c) raiding, hiring, soliciting, or attempting to persuade any SP Plus employees to leave the Company.

(8) Provide me with a detailed description of each and every communication with each and every SP Plus customer regarding (a) your resignation from SP Plus and/or (b) any offer to provide services after your resignation from SP Plus, including the name of each such customer and the date and method of communication. Provide an accounting of all revenues realized by each of you and/or Five Diamond as a result of those efforts.

(9) Affirm that for twelve (12) months from the date on which you come into compliance with the requirements of this letter, you will not directly or indirectly solicit, participate in soliciting, offer, provide, sell, or participate in offering, providing, or selling competitive products or services to any customers or prospective customers of SP Plus with

**Exhibit 2**



Davis Diniz
February 18, 2025
Page 7 of 8

whom you had direct contact or about which you learned confidential information related to such products or services at any time during the 12 months preceding the termination of your employment with SP Plus.

(10)   Reaffirm that you will comply with all other obligations in the Agreement.

(11)   Agree to make SP Plus whole by (a) paying SP Plus for the damage that you may have already caused to the Company by disclosing its trade secrets and confidential information to Five Diamond; and, (b) paying SP Plus's costs and reasonable attorneys' fees incurred in connection with enforcing the Agreement, including in investigating your misconduct and drafting this letter.

If we do not receive the requested responses from you by the deadline set forth above, SP Plus reserves the right to pursue all necessary and appropriate remedies that it may have against you and any other potentially responsible parties. In particular, if SP Plus cannot promptly obtain written assurances that you will act reasonably by complying with the requirements set forth above, it reserves the right to commence litigation against you to fully protect its legitimate business interests through full enforcement of the Agreement and injunctive relief preventing future breaches. If for any reason you do not intend to adhere to your obligations under the Agreement or you believe that you are not obligated to comply with the Agreement, please explain your rationale in your response.

Please be advised that, given the likelihood of litigation, you are on notice that destruction of any relevant information – regardless of where it is stored or on what medium it may be maintained – will be considered spoliation of evidence for which SP Plus will seek appropriate sanctions.

Finally, please note that, to ensure that SP Plus's trade secrets and other Confidential Information (as defined in the Agreement) remain protected, SP Plus is simultaneously sending a separate letter to Mr. Bodenhamer today to seek his and Five Diamond's cooperation in ensuring that they do not put you in a position to run afoul of your ongoing obligations in the course of your new employment.

This letter is not a waiver of any rights that SP Plus may have against you, Five Diamond, or any other responsible parties, all of which are hereby expressly reserved.

**Exhibit 2**



Davis Diniz
February 18, 2025
Page 8 of 8

Sincerely,

Stephen Riden

Enclosure

**Exhibit 2**



Beck Reed Riden LLP
155 Federal Street | Suite 1302
Boston | Massachusetts 02110
Tel. (617) 500-8660 | Fax (617) 500-8665
BeckReedRiden.com

Stephen Riden
Direct: (617) 500-8672
sriden@beckreed.com

February 18, 2025

**BY EMAIL**

Mr. Daniel Brown
10941 Sea Hibiscus Lane
Tamarac, FL 33321
*dbparkum@hotmail.com*

      Re:     <u>Violations of Your Ongoing Obligations to SP Plus Corporation</u>

Dear Mr. Brown:

This firm has been retained as trade secrets / restrictive covenants counsel to SP Plus Corporation, A Metropolis Company ("SP Plus" or the "Company"). I understand that your employment with SP Plus ended on August 15, 2024 and that you (and at least two other former SP Plus employees, Davis Diniz and Kris Horgan) are now employed by Five Diamond Parking, LLC ("Five Diamond"), a direct competitor founded by yet another former SP Plus employee, William Bodenhamer.[1] Furthermore, SP Plus recently learned that you and your former SP Plus colleagues are now reaching out to customers that you directly worked with during your employment at SP Plus to solicit business on behalf of Five Diamond.

Your misconduct is a flagrant violation of your contractual obligations to SP Plus and applicable statutory and common law. In light of your misconduct, I am writing to determine if this situation can be quickly and amicably resolved, and SP Plus's legitimate business interests protected, absent judicial intervention.

As a threshold matter, for any (1) electronic files obtained during or through your employment with SP Plus or (2) electronic files containing SP Plus's trade secrets or other confidential information – regardless of where such files are stored (including on any of your personal devices, in a Dropbox account, or otherwise) – ***do not open or delete them or otherwise change the metadata associated with them***.

While I do not intend, at this juncture, to engage in a lengthy analysis of the claims that SP Plus may have against you or any other potentially responsible parties, please be advised that if the facts are as I understand them, your conduct constitutes, at a minimum, a breach of your contractual obligations and misappropriation of trade secrets.

---

[1] While it seems clear that you are working for Mr. Bodenhamer at Five Diamond or an affiliated entity, please inform me immediately if this information is incorrect.

**Exhibit 3**



Daniel Brown
February 18, 2025
Page 2 of 7

Briefly, the facts as I understand them are as follows:

## YOUR EMPLOYMENT WITH SP PLUS

You were a long-term employee of SP Plus until your resignation on August 15, 2024. Your most recent role for SP Plus was Vice President, Regional Manager III – Hospitality Division in Florida.

In support of your work for SP Plus, you were given extensive training, entrusted with building and maintaining a significant customer base, and provided with ongoing access to highly sensitive information that is proprietary to the Company, including trade secrets and other confidential information concerning its customers, contract terms, and pricing. Given your tenure and level of responsibility with SP Plus, you have extensive connections with its customers throughout Florida, and deep and broad knowledge about SP Plus's trade secrets and confidential information to which you had access.

In connection with your promotion to the role of Vice President, Regional Manager III Hospitality Division, you signed an Executive Employment Agreement (the "Agreement") on July 3, 2017, a copy of which is enclosed, containing, among other things, reasonable noncompete, customer nonsolicit, employee nonsolicit, and nondisclosure restrictive covenants. You expressly agreed, among other things, to the following noncompete restrictions for a period of six (6) months after your termination of employment for any reason:

> Executive will not directly or indirectly…conduct business with any client or customer of the Company with which Executive had any direct contact or responsibility within the twelve months preceding the Date of Termination or about whom Executive acquired any Trade Secret or Confidential Information during his or her employment with the Company;

> [and]

> Executive will not directly or indirectly…become employed by or render services to any competitor of the Company if in so doing the Executive shall directly or indirectly have responsibility for clients, customers or other consulting functions competitive with the Company for which the Executive had responsibilities on behalf of the Company during the twelve months preceding the Date of Termination.

*See* Agreement, § 6(e)(i) –(ii).

You further agreed to customer-focused restrictions, including that

**Exhibit 3**



Daniel Brown
February 18, 2025
Page 3 of 7

> [W]hile he or she is employed by the Company and for a period of six (6) months after the Date of Termination, the Executive shall not, …directly or indirectly contact or solicit business from any client or customer of the Company with whom the Executive had direct contact or responsibility or about whom the Executive acquired any Trade Secret or Confidential Information during his employment with the Company. Likewise, the Executive shall not, …directly or indirectly contact or solicit business from any person responsible for referring business to the Company or who regularly refers business to the Company with whom the Executive had any direct contact or about whom the Executive acquired any Trade Secret or Confidential Information during his employment with the Company….

Agreement, § 6(f)(i).

You also agreed that you would "hold all Trade Secret and Confidential Information in strict confidence and not publish or otherwise disclose any portion thereof to any person whatsoever…," "use all reasonable precautions to assure that the Trade Secret and Confidential Information are properly protected and kept from unauthorized persons or use," and, "make no use of any Trade Secret and Confidential Information except as is required in the performance of Executive's duties for the Company…." Agreement, § 6(c)(i)-(iii). You agreed that this obligation continues ***"during [your] employment and thereafter."*** *Id.* at § 6(c)(emphasis added).

In addition, you agreed to "immediately upon termination of Executive's employment with the Company, whether voluntary or involuntary and regardless of the reason or cause, or upon the request of the Company, promptly return to the Company all Company property including, without limitation, any and all documents, and other things relating to any Trade Secret and Confidential Information, all of which are and shall remain the sole property of the Company." *See* Agreement, § 6(c)(iv).

These restrictions are specifically designed to prevent you from using, disclosing, or otherwise misappropriating trade secrets and other confidential information that you learned through your employment with SP Plus, as well as from trading on SP Plus's customer goodwill for the benefit of its competitors.

As you acknowledged in the Agreement, your failure to comply with these restrictions would result in irreparable harm to SP Plus. *See* Agreement, ¶ 6(g). As such, you agreed that, in addition to other remedies that may be available, SP Plus shall be entitled to a temporary restraining order and/or preliminary injunction to enforce or prevent any violations of such provisions. *See id.*

**Exhibit 3**



Daniel Brown
February 18, 2025
Page 4 of 7

Please be aware that these contractual obligations are in addition to the rights and protections available to SP Plus under state and federal trade secret laws, including the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and other applicable laws.

<u>YOUR POST-EMPLOYMENT MISCONDUCT</u>

In August 2024 you submitted your notice of voluntary resignation to SP Plus. When asked about your plans, you informed SP Plus that you had no future employment plans at that time, but that you did not want to work at SP Plus any longer and suggested that you may be retiring. You expressly asserted that you would not be competing against SP Plus if and when you decided to rejoin the workforce. This information was apparently an attempt to conceal your true post-SP Plus employment plans, as SP Plus has since learned that you are now working for Mr. Bodenhamer at a direct competitor, Five Diamond, in a role nearly identical to the one you held at SP Plus.

Further, not only did SP Plus learn that you had lied about accepting a position with Five Diamond in violation of your noncompete obligation, but it has also discovered that you are violating your other post-employment obligations. Specifically, SP Plus is aware that you are now soliciting SP Plus customers with whom you had direct contact or for whom you were responsible on behalf of Five Diamond. Upon information and belief, at least one SP Plus customer has already abruptly canceled its contract with SP Plus and will be working with Five Diamond as a result of your misconduct. Moreover, your efforts to hide your future employment plans from SP Plus, coupled with your outreach to SP Plus customers after your departure from SP Plus, strongly suggests that you intend to disclose and use SP Plus's trade secrets and other confidential information in your new role at SP Plus, if you have not done so already.

Your misconduct puts SP Plus's trade secrets and other confidential information squarely at risk of imminent use and disclosure. This constitutes a violation of applicable trade secrets laws, as well as various other obligations that you owe to SP Plus. For instance, the misappropriation of SP Plus's trade secrets constitutes a violation the Defend Trade Secrets Act, 18 U.S.C. § 1839, which forbids, *inter alia*, the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret of another without express or implied consent…." If SP Plus is required to file a lawsuit against you based on any misappropriation of its trade secrets, it would seek recovery of multiple damages and its attorneys' fees from you personally.

All such misconduct ***must stop immediately***.

Although SP Plus's investigation into the circumstances of your departure has just begun, in light of the information it has already discovered, you have put SP Plus in the position of

**Exhibit 3**



Daniel Brown
February 18, 2025
Page 5 of 7

needing to promptly determine what steps it will need to take to protect itself and its legitimate business interests from any further harm.

### OPPORTUNITY TO MINIMIZE DAMAGES AND POTENTIALLY AVOID LITIGATION

At this juncture you have a choice.

SP Plus takes the promises you made in the Agreement and your continuing obligations under the law seriously, and it insists that you **immediately** cease and desist from all ongoing violations of your Agreement and comply with the obligations owed by you to SP Plus under the Agreement and state and federal law. Assuming that SP Plus does not discover that you have engaged in, or are continuing to engage in, additional violations of your contractual or legal obligations, we will work with you to determine if SP Plus can adequately protect its legitimate business interests through an amicable and voluntary resolution.

In this regard, if you wish to explore whether it is possible to avoid litigation, please comply with the following *by Monday, February 24, 2025 at 5:00 p.m. (Eastern Time)*:

(1)    Cease all work for Five Diamond in any capacity and enter into a standstill agreement while SP Plus investigates this situation and determines whether escalation can be avoided.

(2)    Explain how your role with Five Diamond does not violate your contractual obligations to SP Plus. Include within that explanation your job title, start date, and a detailed description of your role and responsibilities, including the geographic territory and customer base for which you are responsible.

(3)    Return to me all *physical* documents, files, information, and other property that belong to SP Plus (including any materials located on external storage devices).

(4)    For any *electronic* files that you have taken that (a) you obtained during or through your employment with SP Plus or (b) contain SP Plus's Trade Secrets or other Confidential Information – regardless of where such files are stored (including on any of your personal devices, in your email, in the cloud, or elsewhere) – identify what files you possess and the nature of any SP Plus information contained in them, and I will coordinate with you for the return of such files and their subsequent forensically sound deletion from your possession, custody, and control. Please note, however, that *you must not open or delete any of them or*

**Exhibit 3**



Daniel Brown
February 18, 2025
Page 6 of 7

*otherwise change the metadata associated with them*. Doing so will, among other things, violate your obligations under the law, as set forth below.

(5) Affirm that you have not altered, disposed of, copied, or transferred any of SP Plus's documents, files, information, or other property since receiving this letter.

(6) Provide me with a detailed description of each and every use (other than on behalf of SP Plus during your employment with SP Plus) of SP Plus's Trade Secrets or other Confidential Information, including the name of each and every person working in concert with you.

(7) Affirm that you have ceased, and going forward will refrain from (a) using SP Plus's Trade Secrets and other Confidential Information, (b) doing business with, trying to do business with, or interfering with SP Plus's current and prospective customers, and, (c) directly or indirectly hiring, recruiting or soliciting for employment any SP Plus employees who possess Trade Secrets and other Confidential Information.

(8) Provide me with a detailed description of each and every communication with each and every SP Plus customer regarding (a) your resignation from SP Plus and/or (b) any offer to provide services after your resignation from SP Plus, including the name of each such customer and the date and method of communication. Provide an accounting of all revenues realized by each of you and/or Five Diamond as a result of those efforts.

(9) Affirm that for six (6) months from the date on which you come into compliance with the requirements of this letter, you will not directly or indirectly contact or solicit business from any client or customer of SP Plus with whom you had direct contact or responsibility or about whom you acquired any Trade Secret or Confidential Information during your employment with the SP Plus.

(10) Reaffirm that you will comply with all other obligations in the Agreement.

(11) Agree to make SP Plus whole by (a) paying SP Plus for the damage that you may have already caused to the Company by disclosing its trade secrets and confidential information to Five Diamond; and, (b) paying

**Exhibit 3**



Daniel Brown
February 18, 2025
Page 7 of 7

SP Plus's costs and reasonable attorneys' fees incurred in connection with enforcing the Agreement, including in investigating your misconduct and drafting this letter.

If we do not receive the requested responses from you by the deadline set forth above, SP Plus reserves the right to pursue all necessary and appropriate remedies that it may have against you and any other potentially responsible parties. In particular, if SP Plus cannot promptly obtain written assurances that you will act reasonably by complying with the requirements set forth above, it reserves the right to commence litigation against you to fully protect its legitimate business interests through full enforcement of the Agreement and injunctive relief preventing future breaches. If for any reason you do not intend to adhere to your obligations under the Agreement or you believe that you are not obligated to comply with the Agreement, please explain your rationale in your response.

Please be advised that, given the likelihood of litigation, you are on notice that destruction of any relevant information – regardless of where it is stored or on what medium it may be maintained – will be considered spoliation of evidence for which SP Plus will seek appropriate sanctions.

Finally, please note that, to ensure that SP Plus's trade secrets and other Confidential Information (as defined in the Agreement) remain protected, SP Plus is simultaneously sending a separate letter to Mr. Bodenhamer today to seek his and Five Diamond's cooperation in ensuring that they do not put you in a position to run afoul of your ongoing obligations in the course of your new employment.

This letter is not a waiver of any rights that SP Plus may have against you, Five Diamond, or any other responsible parties, all of which are hereby expressly reserved.

Sincerely,

Stephen Riden

Enclosure

**Exhibit 3**



Beck Reed Riden LLP
155 Federal Street | Suite 1302
Boston | Massachusetts 02110
Tel. (617) 500-8660 | Fax (617) 500-8665
BeckReedRiden.com

**Stephen Riden**
Direct: (617) 500-8672
sriden@beckreed.com

February 18, 2025

*By Email*

Mr. Kristopher Horgan
10851 SW 11 Manor
Davie, FL 33324
*KHorgan2112@gmail.com*

     Re:    <u>Violations of Your Ongoing Obligations to SP Plus Corporation</u>

Dear Mr. Horgan:

This firm has been retained as trade secrets / restrictive covenants counsel to SP Plus Corporation, A Metropolis Company ("SP Plus" or the "Company"). I understand that your employment with SP Plus ended on December 21, 2024 and that you (and at least two other former SP Plus employees, Dan Brown and Davis Diniz) are now employed by Five Diamond Parking, LLC ("Five Diamond"), a direct competitor founded by yet another former SP Plus employee, William Bodenhamer.[1] Furthermore, SP Plus recently learned that you and your former SP Plus colleagues are now reaching out to SP Plus customers to solicit business on behalf of Five Diamond, and likely using the Company's trade secrets and other confidential information in doing so.

Your misconduct is a flagrant violation of your contractual obligations to SP Plus and applicable statutory and common law. In light of your misconduct, I am writing to determine if this situation can be quickly and amicably resolved, and SP Plus's legitimate business interests protected, absent judicial intervention.

As a threshold matter, for any (1) electronic files obtained during or through your employment with SP Plus or (2) electronic files containing SP Plus's trade secrets or other confidential information – regardless of where such files are stored (including on any of your personal devices, in a Dropbox account, or otherwise) – ***do not open or delete them or otherwise change the metadata associated with them***.

While I do not intend, at this juncture, to engage in a lengthy analysis of the claims that SP Plus may have against you or any other potentially responsible parties, please be advised that if the facts are as I understand them, your conduct constitutes, at a minimum, a breach of your contractual obligations and misappropriation of trade secrets.

---

[1] While it seems clear that you are working for Mr. Bodenhamer at Five Diamond or an affiliated entity, please inform me immediately if this information is incorrect.

**Exhibit 4**



Kristopher Horgan
February 18, 2025
Page 2 of 6

Briefly, the facts as I understand them are as follows:

<u>YOUR EMPLOYMENT WITH SP PLUS</u>

You worked for SP Plus from April 2007 until December 21, 2024. Your most recent role for SP Plus was as a Facility Manager located in Fort Lauderdale, Florida.

In support of your work for SP Plus, you were given extensive training, entrusted with building and maintaining a significant customer base, and provided with ongoing access to highly sensitive information that is proprietary to the Company, including trade secrets and other confidential information concerning its customers, contract terms, and pricing. Given your tenure and level of responsibility with SP Plus, you have extensive connections with its customers throughout South Florida, and deep and broad knowledge about SP Plus's trade secrets and confidential information to which you had access.

In connection with your promotion to the role of Facility Manager, you signed an Agreement Regarding Confidentiality (the "Agreement") on December 16, 2017, a copy of which is enclosed, containing, among other things, reasonable nondisclosure and employee nonsolicit restrictive covenants.

You expressly agreed, among other things, that you would not "directly or indirectly utilize for any purpose other than performance of Employee's employment duties for the Company, or disclose to anyone outside of the Company,…any confidential information provided to or obtained by Employee in the course of Employee's employment with the Company or trade secrets of the Company, or any information received by the Company in confidence from or about third parties…." Agreement, § 1. You agreed that this obligation continues **"during or after Employee's employment with the Company**.*" Id.* (emphasis added).

You further agreed that "during Employee's employment with the Company, and for a period of 12 months thereafter, *Employee will not, directly or indirectly, on behalf of Employee or any other person, company or entity, utilize or reveal the identity of or contract or relationship terms with any customer*, employee or temporary personnel used by or served by the Company at any time during the 12 months preceding the termination of Employee's employment with the Company." Agreement, § 3(b) (emphasis added).

In addition, you agreed to "at any time upon the request of the Company and in any event promptly upon termination of Employee's employment with the Company, but in any event no later than two (2) business days after such termination, deliver all [Company property, including electronically-stored information,] to the Company and will not retain any originals or copies of such materials." *See* Agreement, § 2.

**Exhibit 4**



**Beck Reed Riden** LLP

Kristopher Horgan
February 18, 2025
Page 3 of 6

These restrictions are specifically designed to prevent you from using, disclosing, or otherwise misappropriating trade secrets and other confidential information that you learned through your employment with SP Plus, as well as from trading on SP Plus's customer goodwill for the benefit of its competitors.

As you acknowledged in the Agreement, your failure to comply with these restrictions would result in irreparable harm to SP Plus that cannot be adequately compensated solely by money damages. *See* Agreement, § 6. As such, you agreed that, in addition to other remedies at law or in equity that may be available, SP Plus shall be entitled to a temporary restraining order and/or preliminary injunctive relief to enforce or prevent any violations of such provisions. *See id.*

Please be aware that these contractual obligations are in addition to the rights and protections available to SP Plus under state and federal trade secret laws, including the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and other applicable laws.

### YOUR POST-EMPLOYMENT MISCONDUCT

In December 2024 you submitted your notice of voluntary resignation to SP Plus. When asked about your plans, you informed SP Plus that you would be working for Mr. Bodenhamer at USA Transportation, but that you would be running operations for him in North Carolina and only calling on customers in North Carolina. This information was apparently an attempt to conceal your true post-SP Plus employment plans, as SP Plus has since learned that you are now working for Mr. Bodenhamer at a direct competitor, Five Diamond.

Further, not only did SP Plus learn that you had lied about accepting a position with Five Diamond, but it has also discovered that you have misled SP Plus in other ways and are likely violating your other post-employment obligations. Specifically, SP Plus is aware that you are now soliciting SP Plus customers in South Florida on behalf of Five Diamond (not solely in North Carolina and on behalf of USA Transportation). Upon information and belief, at least one SP Plus customer has already abruptly canceled its contract with SP Plus and will be working with Five Diamond as a result of your misconduct. Moreover, your efforts to hide your future employment plans from SP Plus, coupled with your outreach to SP Plus's customers soon after your departure from SP Plus, strongly suggests that you intend to disclose and use SP Plus's trade secrets and other confidential information in your new role at SP Plus in obtaining business for your new employer, if you have not done so already.

Your misconduct puts SP Plus's trade secrets and other confidential information squarely at risk of imminent use and disclosure. This constitutes a violation of applicable trade secrets laws, as well as various other obligations that you owe to SP Plus. For instance, the misappropriation of SP Plus's trade secrets constitutes a violation the Defend Trade Secrets

**Exhibit 4**



Kristopher Horgan
February 18, 2025
Page 4 of 6

Act, 18 U.S.C. § 1839, which forbids, *inter alia*, the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret of another without express or implied consent…." If SP Plus is required to file a lawsuit against you based on any misappropriation of its trade secrets, it would seek recovery of multiple damages and its attorneys' fees from you personally.

All such misconduct ***must stop immediately***.

Although SP Plus's investigation into the circumstances of your departure has just begun, in light of the information it has already discovered, you have put SP Plus in the position of needing to promptly determine what steps it will need to take to protect itself and its legitimate business interests from any further harm.

<u>OPPORTUNITY TO MINIMIZE DAMAGES AND POTENTIALLY AVOID LITIGATION</u>

At this juncture you have a choice.

SP Plus takes the promises you made in the Agreement and your continuing obligations under the law seriously, and it insists that you **immediately** cease and desist from all ongoing violations of your Agreement and comply with the obligations owed by you to SP Plus under the Agreement and state and federal law. Assuming that SP Plus does not discover that you have engaged in, or are continuing to engage in, additional violations of your contractual or legal obligations, we will work with you to determine if SP Plus can adequately protect its legitimate business interests through an amicable and voluntary resolution.

In this regard, if you wish to explore whether it is possible to avoid litigation, please comply with the following ***by Monday, February 24, 2025 at 5:00 p.m. (Eastern Time)***:

(1)     Cease all work for Five Diamond in any capacity and enter into a standstill agreement while SP Plus investigates this situation and determines whether escalation can be avoided.

(2)     Explain how your role with Five Diamond does not violate your contractual obligations to SP Plus. Include within that explanation your job title, start date, and a detailed description of your role and responsibilities, including the geographic territory and customer base for which you are responsible.

(3)     Return to me all ***physical*** documents, files, information, and other property that belong to SP Plus (including any materials located on external storage devices).

**Exhibit 4**



Kristopher Horgan
February 18, 2025
Page 5 of 6

(4)     For any *electronic* files that you have taken that (a) you obtained during or through your employment with SP Plus or (b) contain SP Plus's trade secrets or other confidential information – regardless of where such files are stored (including on any of your personal devices, in your email, in the cloud, or elsewhere) – identify what files you possess and the nature of any SP Plus information contained in them, and I will coordinate with you for the return of such files and their subsequent forensically sound deletion from your possession, custody, and control. Please note, however, that *you must not open or delete any of them or otherwise change the metadata associated with them*. Doing so will, among other things, violate your obligations under the law, as set forth below.

(5)     Affirm that you have not altered, disposed of, copied, or transferred any of SP Plus's documents, files, information, or other property since receiving this letter.

(6)     Provide me with a detailed description of each and every use (other than on behalf of SP Plus during your employment with SP Plus) of SP Plus's trade secrets or other confidential information, including the name of each and every person working in concert with you.

(7)     Affirm that you have ceased, and going forward will refrain from (a) using SP Plus's trade secrets and other confidential information, and (b) raiding, hiring, soliciting, or attempting to persuade any SP Plus employees to leave the Company.

(8)     Provide me with a detailed description of each and every communication with each and every SP Plus customer regarding (a) your resignation from SP Plus and/or (b) any offer to provide services after your resignation from SP Plus, including the name of each such customer and the date and method of communication. Provide an accounting of all revenues realized by each of you and/or Five Diamond as a result of those efforts.

(9)     Reaffirm that you will comply with all other obligations in the Agreement.

(10)    Agree to make SP Plus whole by (a) paying SP Plus for the damage that you may have already caused to the Company by disclosing its trade secrets and confidential information to Five Diamond; and, (b) paying

**Exhibit 4**



Kristopher Horgan
February 18, 2025
Page 6 of 6

SP Plus's costs and reasonable attorneys' fees incurred in connection with enforcing the Agreement, including in investigating your misconduct and drafting this letter.

If we do not receive the requested responses from you by the deadline set forth above, SP Plus reserves the right to pursue all necessary and appropriate remedies that it may have against you and any other potentially responsible parties. In particular, if SP Plus cannot promptly obtain written assurances that you will act reasonably by complying with the requirements set forth above, it reserves the right to commence litigation against you to fully protect its legitimate business interests through full enforcement of the Agreement and injunctive relief preventing future breaches. If for any reason you do not intend to adhere to your obligations under the Agreement or you believe that you are not obligated to comply with the Agreement, please explain your rationale in your response.

Please be advised that, given the likelihood of litigation, you are on notice that destruction of any relevant information – regardless of where it is stored or on what medium it may be maintained – will be considered spoliation of evidence for which SP Plus will seek appropriate sanctions.

Finally, please note that, to ensure that SP Plus's trade secrets and other Confidential Information (as defined in the Agreement) remain protected, SP Plus is simultaneously sending a separate letter to Mr. Bodenhamer today to seek his and Five Diamond's cooperation in ensuring that they do not put you in a position to run afoul of your ongoing obligations in the course of your new employment.

This letter is not a waiver of any rights that SP Plus may have against you, Five Diamond, or any other responsible parties, all of which are hereby expressly reserved.

Sincerely,

Stephen Riden

Enclosure

**Exhibit 4**



Beck Reed Riden LLP
155 Federal Street | Suite 1302
Boston | Massachusetts 02110
Tel. (617) 500-8660 | Fax (617) 500-8665
BeckReedRiden.com

**Stephen Riden**
Direct: (617) 500-8672
sriden@beckreed.com

February 18, 2025

_**By Email**_

William Bodenhamer, Jr.
Five Diamond Parking, LLC
1330 SE 4th Avenue, Suite A
Fort Lauderdale, FL 33316
_wbodenhamer@usatrans.com_

Re:    <u>Five Diamond Parking, LLC, Raiding of SP Plus</u>

Dear Mr. Bodenhamer:

This firm serves as trade secrets/restrictive covenants counsel to SP Plus Corporation, A Metropolis Company ("SP Plus" or the "Company"). I am writing to you regarding the apparent corporate raiding of SP Plus employees by Five Diamond Parking, LLC, and/or its affiliates ("Five Diamond"). In particular, SP Plus is aware that at least three of its employees – Davis Diniz, Dan Brown, and Kris Horgan – have left SP Plus in quick succession since August 2024, and have since started working for you at Five Diamond.

Accordingly, it appears that Five Diamond is targeting SP Plus employees who – as Five Diamond is aware – have knowledge and/or possession of SP Plus's confidential information. Given your awareness of these facts, SP Plus is concerned that Five Diamond is intentionally interfering with SP Plus's trade secrets and contractual rights, and is using these former SP Plus employees to misappropriate SP Plus's information, solicit SP Plus's customers or prospective customers, or otherwise unfairly and unlawfully compete with SP Plus.

In this regard, SP Plus is aware that Diniz, Brown, and Horgan are now soliciting SP Plus customers in South Florida on behalf of Five Diamond. Upon information and belief, at least one SP Plus customer has already abruptly canceled its contract with SP Plus and will be working with Five Diamond as a result of their misconduct. SP Plus has also just learned that Diniz, in his final weeks at the Company, sent to his personal email address multiple SP Plus documents, including highly confidential documents concerning customer contacts and pricing. In addition, while Diniz was still working for SP Plus, he sent confidential SP Plus information to Brown _after_ Brown started working for Five Diamond. Given the sensitive nature of SP Plus's business information to which Diniz had access and took outside the Company, SP Plus is constrained to share the information contained in this letter with you in order to further protect its legitimate business interests. Our investigation is ongoing.

**Exhibit 5**



William Bodenhamer, Jr.
February 18, 2025
Page 2 of 3

Given these circumstances, please be advised that SP Plus is prepared to take all necessary and appropriate action to protect its rights. Since each of the above-referenced individuals was privy to SP Plus's proprietary and confidential information, Five Diamond, as a competitor of SP Plus, is in a position to use SP Plus's confidential information known by these individuals to unfairly and unlawfully compete with SP Plus.

Through this letter, Five Diamond is being given notice that these individuals are each bound by contractual nondisclosure and no-recruit obligations to SP Plus. In addition, Diniz and Brown are also each bound by contractual noncompete and customer nonsolicit obligations to SP Plus. Further, current and former SP Plus employees also have continuing obligations to SP Plus under state and federal law. In the event SP Plus is required is required file a lawsuit against any of its former employees who now work for Five Diamond based on, *e.g.*, the former employee's violation of their SP Plus employment agreement, or any misappropriation of its trade secrets, SP Plus would of course consider adding Five Diamond as a defendant, too.

In the case of Diniz, who took SP Plus's highly confidential information before he left, SP Plus is justifiably concerned that, because he is working for Five Diamond, he is in a position to improperly capitalize on SP Plus's confidential information for the benefit of SP Plus's competitor. In addition, Diniz expressly agreed, among other things, to the following noncompete restriction with SP Plus in his Agreement Regarding Confidentiality and Non-Competition, dated January 6, 2020:

> during Employee's employment with the Company, and for a period of 12 months thereafter, Employee will not…be employed by any entity which is in competition with the Company within a 75 mile radius of any of the Company offices from which Employee worked during the 12 months preceding the termination of Employee's employment with the Company.

As Diniz's new employer, SP Plus requests that you take all required steps internally at Five Diamond to ensure that no SP Plus business information is retained, disclosed, and/or used, directly or indirectly, by Diniz or by or to the benefit of Five Diamond.  In particular, SP Plus requests that you immediately:

(1) Conduct a diligent search to identify any SP Plus business information from Diniz, Brown, and/or Horgan on Five Diamond's systems or otherwise in Five Diamond's possession, custody, or control.

(2) Identify what SP Plus business information from Diniz, Brown, and/or Horgan you possess and the nature of any SP Plus information contained in them, and I will coordinate with you for the return of such files and their subsequent forensically sound deletion from your possession, custody, and control. Please

**Exhibit 5**



William Bodenhamer, Jr.
February 18, 2025
Page 3 of 3

note, however, that **you must not open or delete any of them or otherwise change the metadata associated with them**. Doing so will, among other things, violate your obligations under the law, as set forth below.

(3) Not employ Diniz in any capacity that violates the terms of his noncompete restriction or in which he would likely use or disclose (directly or indirectly) any of SP Plus's confidential information.

Given the significant value of the SP Plus information at stake, SP Plus considers the above requests reasonable and expects that Five Diamond will take actions to comply. **<u>Please confirm in writing _by Monday, February 24, 2025 at 5:00 p.m. (Eastern Time)_, that Five Diamond has taken – or intends to take – the steps requested above</u>**.

Please be advised that, given the possibility of litigation, Five Diamond is on notice that destruction of any relevant information – regardless of where it is stored or on what medium it may be maintained – will be considered spoliation of evidence for which SP Plus will seek appropriate sanctions. Accordingly, I respectfully request that Five Diamond immediately institute a litigation hold with respect to: (i) the electronic devices and all associated information for all former SP Plus employees or contractors who have joined Five Diamond since January 2024; (ii) the devices and accounts of any Five Diamond employees who may have accessed or received confidential SP Plus information; and (3) all other material potentially relevant to this matter.

Finally, given the seriousness and potential for harm to SP Plus, we request that by **_Monday, February 24, 2025 at 5:00 p.m. (Eastern Time)_**, Five Diamond provide SP Plus with assurances that you: (a) do not countenance the above-referenced individuals' use or disclosure of any SP Plus information in the course of their Five Diamond employment; (b) will expressly instruct all former SP Plus employees and/or contractors who have joined Five Diamond since January 2024 to refrain from engaging in any duties on behalf of Five Diamond that would violate their obligations to SP Plus, or place SP Plus's information at risk of use or disclosure; and (c) will not interfere with the same individuals' contractual and other legal obligations to SP Plus. These are the minimum assurances that SP Plus needs if we are to avoid further escalation.

This letter is not a waiver of any rights or remedies available to SP Plus against any and all responsible parties, whether at law or in equity, all of which are expressly reserved.

Sincerely,

Stephen Riden

**Exhibit 5**



Tanya L. Bower
Direct Dial: 954.760.4924
Email: tlb@trippscott.com

February 24, 2025

**Via email sriden@beckreed.com**
Stephen Riden, Esq.
155 Federal Street, Suite 1302
Boston, MA  02110

RE:    Five Diamond Parking, LLC, Davis Diniz, Kristopher Horgan, and Daniel Brown

Dear Mr. Riden:

This firm serves as general corporate counsel for Mr. William Bodenhamer. Mr. Bodenhamer has shared your letter dated February 18, 2025 sent on behalf of SP Plus Corporation. Additionally, Mr. Bodenhamer has also shared the letters addressed to Mr. Kristopher Horgan, Mr. Daniel Brown and Mr. Davis Diniz sent by you on behalf of SP Plus Corporation. The allegations in all four letters are completely unfounded and inaccurate.

Of the three former employees of SP Plus Corporation, the only person who was working for Five Diamond at the time of your letter or prior was Mr. Horgan. Mr. Horgan supplied the Agreement Regarding Confidentiality that he signed with SP+ to Mr. Bodenhamer and Five Diamond Parking, LLC. Mr. Bodenhamer reviewed the restrictions to which Mr. Horgan was subject and employed him in a position that would not violate the restrictions. Further, Mr. Bodenhamer has instructed Mr. Horgan to not reach out to or solicit current or former employees of SP Plus to work at Five Diamond. To date, Mr. Horgan has not solicited any current or former employees of SP Plus to work for Five Diamond or any entity which Mr. Bodenhamer owns or manages. Mr. Horgan and Five Diamond will respect the non-solicitation restriction in the Agreement Regarding Confidentiality.

Mr. Diniz is not employed by Five Diamond. Mr. Diniz is employed by USA Transportation which provides limousine and other transfer transportation services to individuals and hotels. Mr. Diniz contacted Mr. Bodenhamer about employment after he left SP Plus's employ to see if Mr. Bodenhamer had any work available to work for him. While Mr. Diniz is not currently employed by nor providing services for Five Diamond Parking, Mr. Bodenhamer may consider retaining him to work for Five Diamond Parking in the future, Mr. Bodenhamer is aware of the 75 mile radius restriction from the SP Plus Ft. Lauderdale office. If Mr. Diniz shifts his time to work for Five Daimond Parking in the future, Mr. Bodenhamer and Five Diamond

1834578v1 890000.9001

110 Southeast Sixth Street • Fifteenth Floor • Fort Lauderdale, Florida 33301
Tel 954.525.7500 • Fax 954.761.8475 • www.trippscott.com
Fort Lauderdale • Boca Raton • Tallahassee
#3098980v1-993629.0001

**Exhibit 6**

will insist that any such work soliciting clients for Five Diamond occur outside of the 75 mile radius of SP Plus's Ft. Lauderdale Office. Further, both Mr. Bodenhamer and I have questioned Mr. Diniz regarding your allegation that Mr. Diniz copied information that amounts to confidential or trade secret information prior to his resignation. Mr. Diniz denies such a claim is true.

Mr. Brown did not violate any of his restrictive covenants under his Executive Employment Agreement. At no time prior to the expiration of the six-month term of his non-compete covenant or non-solicitation covenant did Mr. Brown work for Five Diamond Parking. Further, after being unemployed for almost 6 months, Mr. Brown contacted Mr. Bodenhamer to determine if Mr. Bodenhamer had any employment positions open to which Mr. Brown would be a good candidate. It is only after the expiration of Mr. Brown's restrictive covenants did he begin to work for Five Diamond Parking.

Mr. Bodenhamer did not raid SP Plus employees or clients. The former SP Plus employees are also former employees of Mr. Bodenhamer prior to acquisition of his parking company by Central Parking. It is only natural that former employees, who enjoyed working with Mr. Bodenhamer and who had remained in contact with him for decades, would reach out to see if Mr. Bodenhamer had any positions open at any of his numerous companies. Instead of blaming Mr. Bodenhamer and alleging corporate raiding, perhaps your client should look to see and understand why their employees are leaving in mass numbers. Mr. Bodenhamer has heard through industry channels that many of SP Plus's employees are leaving as result of the merger with Metropolis and the change in operations.

In regard to your allegations Mr. Bodenhamer and Five Diamond are raiding SP Plus's clients, you could not be more wrong. The loss of one client in one of the over 100 cities SP Plus provides services by no definition is a raid. In fact, Mr. Bodenhamer is not going after SP Plus's clients. Five Diamond has enough opportunities available to it without looking at SP Plus's clients. It is purely by coincidence that one former client of SP Plus has terminated SP Plus's services and retained Five Diamond. The primary principal of this former client and Mr. Bodenhamer have been acquaintances since 1991 and have worked professionally and on community activities together. Mr. Bodenhamer was having a purely social conversation with the principal and upon hearing Mr. Bodenhamer's recent starting up of Five Diamond did the conversation turn to the poor performance of SP Plus and the principal's desire to change parking service providers. Again, another example of over exaggeration to feed your threatening storyline.

Be assured, neither Mr. Bodenhamer nor Five Diamond is intending to lure the employees or clients away from SP Plus. Five Diamond has been aware of and will continue to be cognizant of the restrictions and limitations remaining on Mr. Diniz and Mr. Horgan. Five Diamond will continue to go out of its way to not cause Mr. Diniz and Mr. Horgan to violate their restrictive covenants. Five Diamond has not asked nor will it request that any of Mr. Diniz, Mr. Horgan or Mr. Brown violate their confidentiality covenants nor will they be asked to share any trade secrets of SP Plus, to the extent the have any knowledge of the trade secrets. Five Diamond has no need for the supposed trade secrets since Mr. Bodenhamer is an expert on

**Exhibit 6**

Page **3** of **3**

parking services and is viewed as such in the industry. Five Diamond has requested Mr. Diniz, Mr. Horgan and Mr. Brown return any information they may have inadvertently taken with them when they ceased employment in SP Plus, and all three maintain they did not take any information.

Five Diamond will continue to respect the legal obligations owed by Mr. Diniz, Mr. Horgan and Mr. Brown to SP Plus. These assurances should complete your inquiry and close this matter.

Regards,

*Tanya L. Bower*

TANYA L. BOWER
For the Firm

cc:     William Bodenhamer

**Exhibit 6**