UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SP PLUS LLC,

    Plaintiff,

    v.

DAVIS DINIZ,

    Defendant.

Case No. 25-cv-02563

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY,
A PRESERVATION ORDER, AND A PROTECTIVE ORDER**

Plaintiff SP Plus LLC ("SP Plus" or the "Company"), by and through its undersigned counsel, respectfully submits this Memorandum in Support of Plaintiff's Motion for Expedited Discovery, a Preservation Order, and a Protective Order (the "Motion").

## INTRODUCTION

Pursuant to the Motion, SP Plus requests this Court enter an Order permitting SP Plus to take limited expedited discovery to ascertain the extent of Defendant Davis Diniz's ("Diniz") access to and misappropriation of SP Plus's trade secrets and other confidential information. As set forth more fully in SP Plus's Verified Complaint (Dkt. No. 1),[1] incorporated herein by reference, Diniz is in continuous breach of his contractual obligations to SP Plus. It appears Diniz has used, and is continuing to use, SP Plus's trade secrets and other confidential information in a concerted effort to solicit SP Plus's customers and employees and divert business away from SP

---

[1] The Verified Complaint is cited herein as "Compl., ¶ ___."

Plus to a direct competitor.

SP Plus intends to promptly move for a preliminary injunction to obtain immediate relief from Diniz's unlawful conduct. However, certain critical information relevant to that motion remains exclusively in Diniz's hands, necessitating this Motion. Specifically, SP Plus seeks leave to take the limited discovery identified below, which is designed to elicit factual information related to SP Plus's claims, preserve evidence of the misappropriation, and assess the extent of ongoing and irreparable harm to SP Plus resulting from Diniz's unlawful actions. SP Plus also requests entry of a Protective Order pursuant to Fed. R. Civ. P. 26(c)(1)(G) to protect its trade secrets and other confidential information.

## **BACKGROUND**

SP Plus operates throughout North America and Europe providing parking facility management and related services. Compl, ¶ 18. The Company offers professional parking management, ground transportation, luggage logistics, facility maintenance, and event logistics in a wide range of industries, including aviation, commercial, hospitality, and institutional sectors. Compl., ¶ 19. SP Plus has a dedicated Hospitality Services group that specializes in serving the hotel industry by managing parking and customer service operations at more than 350 hotels across the United States. Compl., ¶ 22. The Company provides its hospitality clients with valet services, self-parking options, and transportation solutions designed to enhance guest experiences. Compl., ¶ 22. Diniz was employed in the Company's Hospitality Services group at the time of his voluntary resignation in January 2025. *See* Compl., ¶¶ 3, 38.

At that time, he ***affirmatively misled*** SP Plus about his post-employment intentions by stating that he intended to take time off from work and travel. Compl., ¶¶ 3-4. SP Plus believes that Diniz is, instead, working on behalf of Five Diamond Parking LLC (or a related entity) –

2

which directly competes with SP Plus in South Florida – under the guise of employment by a related entity, USA Transportation.[2] Compl., ¶ 4. Five Diamond Parking LLC was founded by another former SP Plus employee, William H. Bodenhamer, Jr. ("Bodenhamer"). Compl., ¶ 23. Diniz's work on behalf of Five Diamond is a direct violation of his noncompete obligations to SP Plus. Compl., ¶ 5.

Diniz's deception regarding his new employer and his violation of his noncompete are simply the beginning of what appears to be an astonishing amount of misconduct, which he has attempted to conceal with ongoing lies. Specifically, despite denying in a written response to SP Plus through his attorney that he took SP Plus's trade secrets and other confidential information, *see* Compl., ¶¶ 10, 77, Ex. 6, **the actual scale of the misappropriation that SP Plus has been able to uncover to date is staggering**. *See* Compl., ¶¶ 6-7. The following is a sampling of SP Plus's information that Diniz transmitted – without authorization – to his personal email account and/or to Bodenhamer and other former SP Plus employees who have also left SP Plus to work for Five Diamond (Dan Brown and Kristopher Horgan) in the lead up to his departure from SP Plus:

a. **January 20, 2025** – Diniz sent to his personal email account: (1) a parking management services agreement between a subsidiary of SP Plus (USA Parking) and Customer B,[3] and (2) a valet parking agreement contract with Customer C. Compl., ¶ 56(a).

b. **January 20, 2025** – Diniz sent to his personal email account an organization chart/spreadsheet containing contacts at various venues in Fort Lauderdale. Compl., ¶ 56(b).

c. **January 20, 2025** – Diniz sent to his personal email account three spreadsheets containing extensive deal information for Customer B. These spreadsheets contain the clear notice that they are submitted "in

---

[2] Five Diamond Parking LLC, together with USA Transportation, are collectively referred to herein as "Five Diamond"; given the lack of clarity as to which entity Diniz is providing services for, the term "Five Diamond" as used herein can refer to either Five Diamond Parking LLC or USA Transportation, or both.

[3] In order to maintain confidentiality, this pleading does not name the individual customers, and pseudonyms will be used instead until an appropriate protective order is in place.

confidence, not to be disclosed to any other person without our prior written consent." The spreadsheets contain detailed, confidential analysis of revenue, profits, expenses, payroll figures, financial assumptions, and statistics. Compl., ¶ 56(c).

d. **January 10, 2025** – Diniz emailed to his personal email address a February 2024 schedule of property visits for one of SP Plus's major hotel customers in the Fort Lauderdale market. Significantly, the schedule identifies each property in that area (thirteen in total), together with the name of each property's General Manager and his/her main and cell numbers. Compl., ¶ 56(d).

e. **January 9, 2025** – Diniz emailed to his personal email address a screenshot of a spreadsheet containing information about SP Plus employees and information about their performance. Compl., ¶ 56(e).

f. **January 8, 2025** – Diniz emailed to his personal email address – *and separately forwarded, an hour later, to Brown at a USA Transportation email address* (*...@usatrans.com*) – a detailed proposal to provide parking management services, specifically full management of valet services, to a then-prospective university customer. That customer is a current SP Plus customer. Notably, the proposal contains the following language designating it as confidential: "No material may be used, reproduced or distributed without the written permission of SP Plus Corporation." Compl., ¶ 56(f).

g. **January 8, 2025** – Diniz emailed to his personal email address two spreadsheets with extensive deal information between SP Plus's subsidiary, USA Parking, and two customers, Customer D and Customer E. Both spreadsheets contain the clear notice that they are submitted "in confidence, not to be disclosed to any other person without our prior written consent." The spreadsheets contain detailed, confidential analysis of revenue, profits, expenses, payroll figures, financial assumptions, and statistics. Compl., ¶ 56(g).

h. **December 12, 2024** – Diniz emailed to his personal email address two Excel spreadsheets with market surveys of hotels located within Broward County and Palm Beach County, Florida. *Notably, Diniz emailed these files not only to his personal email address, but also to Horgan at Horgan's personal email address.* These data compilations were created by and for SP Plus through significant effort and investment. Compl., ¶ 56(h).

i. **December 12, 2024** – Diniz forwarded to Bodenhamer two email chains from September 2024 concerning a SP Plus customer's purchase and installation of a key lock box. Significantly, the underlying

4

communications included the nonpublic email address of that customer contact. Compl., ¶ 56(i).

j. **December 11, 2024** – Diniz emailed to his personal email address a document template which is used by SP Plus's hotel customers when lodging a claim for damage. Compl., ¶ 56(j).

k. **November 22, 2024** – Diniz sent to his personal email account an internal SP Plus spreadsheet containing parking rates for various properties. Compl., ¶ 56(k).

l. **November 21, 2024** – Diniz sent to his personal email address a proposal from SP Plus's subsidiary, USA Parking, for an event put on by the Customer F. Compl., ¶ 56(l).

m. **November 21, 2024** – Diniz emailed to his personal email address three files containing proposals submitted by SP Plus's subsidiary, USA Parking, to three different customers for event parking. These proposals contain confidential pricing and staffing information for each event. Compl., ¶ 56(m).

In sum, in the weeks leading up to Diniz's departure, he surreptitiously forwarded several confidential spreadsheets to his personal email account, each containing extensive financial details of SP Plus's customer relationships – proprietary data that could provide a significant competitive advantage to a rival company. Compl., ¶ 6. ***But his actions did not stop there***. Compl., ¶ 6. While Diniz was still working for SP Plus, he directly transmitted confidential contact information to the owner of his new employer, ensuring that the company he was joining would have immediate access to one of SP Plus's key clients. Compl., ¶ 6. Additionally, he shared detailed, highly sensitive reports with former colleagues who had also defected to the same competitor, effectively enabling them to leverage SP Plus's strategic data in their new roles. Compl., ¶ 6.

SP Plus's preliminary investigation, which is ongoing, has revealed other suspicious activity by Diniz suggesting that – contrary to his denial in response to SP Plus's demand letter – significant amounts of SP Plus's physical and electronic files containing its trade secrets and other confidential information remain in his possession. *See* Compl., ¶ 60.

5

SP Plus's audit logs documenting activity associated with Diniz's user profile on SP Plus's systems show bulk permission changes to *thousands* of SP Plus documents to permit those documents to be shared with Diniz's @live.com personal email account. Compl., ¶ 62. This bulk change occurred on January 23, 2025, and then was undone on January 24, 2025 – just a few days before he left SP Plus. Compl., ¶ 62. On the same day that the bulk permission change was executed, emails sent to Diniz's SP Plus email address indicate that Diniz initiated access to a personal Google account associated with his @live.com email address – further suggesting a conduit of misappropriation from SP Plus's Google Drive to his own personal Google Drive. Compl., ¶ 62. The activity suggests that *Diniz misappropriated SP Plus's information on a vast scale*. Compl., ¶ 62.

SP Plus has also discovered that, in his former SP Plus office, Diniz left behind drawers filled with SP Plus physical files. Compl., ¶ 63. However, the contents of the SP Plus physical files related to the Fort Lauderdale area are missing. Compl., ¶ 63. SP Plus did not remove those files, and Diniz has not returned any such files to SP Plus. Compl., ¶ 63.

As it currently stands, only Diniz knows the full scope of his misconduct and has proven himself to be all-too ready to lie to conceal it. Accordingly, as set forth below, there is ample good cause to allow the Motion, and it easily satisfies the reasonableness standard applied by courts in evaluating such requests.

## ARGUMENT AND AUTHORITY

### I. Legal Standard to Be Applied in Evaluating Motions for Expedited Discovery.

The Federal Rules of Civil Procedure give the Court broad discretion over the timing of the discovery sought here by SP Plus. *See* Fed. R. Civ. P. 26(d)(1); *see also* Notes of Advisory Committee on Rules – 1993 Amendments (formal discovery can begin earlier than the Rule 26(f)

conference by court order and "…will be appropriate in some cases, such as those involving requests for a preliminary injunction…."). With respect to both answers to interrogatories and requests for production of documents, the Court may also shorten the response period. *See* Fed. R. Civ. P. 33(b)(2) and 34(b)(2).

Accordingly, courts are empowered to authorize expedited discovery, including expediting the commencement of the discovery period, upon a showing of good cause. *See* Fed. R. Civ. P. 26(d), 33(a), and 34(b); *CampaignZERO, Inc. v. StayWoke Inc.*, 2020 WL 7123066, at *1 (N.D. Ill. Dec. 4, 2020); *Hard Drive Prods., Inc. v. Doe*, 283 F.R.D. 409, 410 (N.D. Ill. 2012); *see also* 8A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, *Federal Practice and Procedure*, § 2046.1 (3d ed. 1998) (observing that while the Federal Rules do not explicitly say so, "it is implicit that some showing of good cause should be made to justify such an order"). Good cause exists when the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party. *Hard Drive Prods., Inc.*, 283 F.R.D. at 410.

In the Seventh Circuit, district courts evaluate whether there is good cause for a motion for expedited discovery "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *Bicycle Peddler, LLC v. Does 1-12*, 295 F.R.D. 274, 277 (N.D. Ill. 2013) (quoting *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 554 (N.D. Ill. 2011)). *See also CampaignZERO, Inc.*, 2020 WL 7123066, at *1 (citing *Ibarra*, 816 F. Supp. 2d at 554). "In applying the 'reasonableness' standard, factors a Court may consider include: '(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request is made.'" *Ibarra*, 816 F.

7

Supp. 2d at 554 (internal citation omitted). Here, all factors weigh in favor of finding that good cause exists for an order granting the expedited, limited discovery requested by SP Plus.

Expedited discovery and a preservation order are particularly appropriate where the plaintiff intends to seek preliminary injunctive relief to cure irreparable injury and the requests are properly tailored. *See CampaignZERO, Inc.*, 2020 WL 7123066, at *2 (allowing limited and narrowly-tailored expedited discovery because the requests were appropriate to support plaintiff's preliminary injunction motion and would not impose a significant burden on defendants); *see also Shutterfly, Inc. v. ForeverArts, Inc.*, 2012 WL 2911887, at *3 (N.D. Cal. July 13, 2012) (ordering limited expedited discovery and issuing preservation order prior to a preliminary injunction hearing where ex-employee allegedly wrongfully copied trade secrets from plaintiff's computer and used the information to establish competitive websites).

Moreover, expedited discovery is frequently granted in cases such as this one concerning alleged misappropriation of trade secrets and violations of restrictive covenants. *See, e.g., loanDepot.com, LLC v. Schneider*, 647 F. Supp. 3d 620, 627 (N.D. Ill. 2022) (parties engaged in expedited discovery following issuance of temporary restraining order to prepare for preliminary injunction proceedings in case alleging misappropriation of trade secrets and breaches of employment agreements by group of former employees); *Admiin Inc. v. Kohan*, 2023 WL 4625897, at *13 (N.D. Ill. Jul. 19, 2023) (permitting limited expedited discovery where former employee allegedly misappropriated trade secrets and violated restrictive covenants); *Inventus Power, Inc. v. Shenzhen Ace Battery Co., Ltd.*, 2020 WL 3960451, at *14 (N.D. Ill. Jul. 13, 2020) (allowing expedited discovery in case alleging misappropriation of trade secrets by former employees and further stating that "inspections of devices used by the individuals in question while working for Defendant seems a highly logical place to focus attention in determining whether any

8

of Plaintiffs' trade secrets have been disclosed to and used by Defendant"); *KPM Analytics N. Am. v. Blue Sun Sci., LLC*, 540 F. Supp. 3d 145, 146 (D. Mass. 2021) (expedited discovery allowed in case alleging theft of trade secrets, breach of contract, and conversion by group of former employees); *Peoplestrategy, Inc. v. Lively Employer Servs., Inc.*, 2020 WL 7869214, at *2 (D.N.J. Aug. 28, 2020) (district court had permitted expedited discovery in case alleging misappropriation of trade secrets and breaches of employment agreements).

**II.     SP Plus's Motion Satisfies the First and Third Factors of the Reasonableness Standard.**

As for the first and third factors of the reasonableness standard, SP Plus needs expedited discovery to prepare its forthcoming preliminary injunction motion, confirm Diniz's ongoing breaches of the Agreement, determine the extent of Diniz's misappropriation and use of SP Plus's trade secrets and other confidential information, and obtain information needed to mitigate SP Plus's damages and irreparable harm. SP Plus's preliminary investigation (limited only to information that SP Plus can presently access) has revealed that Diniz surreptitiously took critical information containing its trade secrets and other confidential and proprietary information. *See* Compl., ¶¶ 6-7, 56, 62. And, in response to SP Plus's demand letter, Diniz, through counsel, brazenly lied about taking any SP Plus information with him. *See* Compl., ¶ 77, Ex. 6.

SP Plus's fears that Diniz will continue to exploit its trade secrets and other confidential information, to usurp its goodwill, and to take its customers and employees are, therefore, well-founded and render expedited discovery appropriate in this instance. SP Plus's need to understand the full scope of harm and potential harm caused by Diniz is manifest and urgent – that information is almost entirely within Diniz's possession.[4] Without expedited discovery to reveal the full details

---

[4] For example, without the benefit of expedited discovery, SP Plus has no way of determining and safeguarding the trade secrets and other confidential information that Diniz transmitted to his personal email account, Bodenhamer,

of Diniz's work on behalf of Five Diamond and/or USA Transportation, and what Diniz has done with SP Plus's trade secrets and other confidential information for those entities, it will be difficult, if not impossible, for SP Plus and/or the Court to properly craft the relief necessary to maintain the *status quo* at a hearing on SP Plus's anticipated application for a preliminary injunction. For these reasons, courts routinely hold that expedited discovery is warranted in cases involving misappropriation and breaches of restrictive covenants agreements to permit the plaintiff to quickly determine what information was taken by the defendant and how it is being used or jeopardized. *See, e.g., Inventus Power, Inc.*, 2020 WL 3960451, at *14; *KPM Analytics N. Am.*, 540 F. Supp. 3d at 146. In short, Diniz should not be permitted to cause harm to SP Plus and then further benefit from his misconduct by being the only party who knows its scope.

Moreover, if any information is destroyed or tampered with (which is a distinct possibility given Diniz's previous deceptions), SP Plus will be further irreparably harmed because it will have no ability to accurately evaluate the full extent of Diniz's misconduct. Accordingly, SP Plus needs the requested discovery and preservation order to determine the extent to which Diniz has harmed it, and to determine how best to swiftly contain and mitigate that damage, if possible.

### III. SP Plus's Motion Satisfies the Second and Fourth Factors of the Reasonableness Standard.

As for the second and fourth factors of the reasonableness test, the requested discovery is not overly broad or unduly burdensome. The burden on Diniz to comply with SP Plus's request for expedited discovery is minimal because SP Plus's proposed requests are reasonable in scope and narrowly tailored to those issues relevant and necessary for a preliminary injunction motion and hearing. The proposed discovery is limited to key facts such as the location(s) and scope of

---

and the Former Employees, or any other such information that may have been shared to his personal Google Drive and retained by him. *See* Compl., ¶¶ 56, 62.

10

the materials misappropriated from SP Plus; the persons to whom SP Plus's trade secrets and other confidential information have been disseminated; and, the SP Plus customers and employees with whom Diniz has been communicating in connection with his work for Five Diamond and/or USA Transportation. *See* Exhibits B and C, attached to the Motion. SP Plus has limited its discovery requests to only 6 interrogatories and 8 document production requests; consequently, the burden of answering the interrogatories and collecting responsive documents within a shortened timeframe is minimal. The information that SP Plus seeks is within the possession and control of Diniz and readily accessible to him. Given what SP Plus has lost and stands to lose in the very near future, the comparative burden on Diniz is virtually nil.

## IV.    SP Plus's Motion Satisfies the Fifth Factor of the Reasonableness Standard.

With respect to the final factor of the reasonableness standard, although SP Plus seeks discovery in advance of the typical discovery process, courts have generally allowed expedited discovery under similar facts in cases involving misappropriation of trade secrets and violations of restrictive covenants, particularly where the requested discovery is necessary for an adjudication of an application for a preliminary injunction. *See, e.g., Admiin Inc.*, 2023 WL 4625897, at *13 (finding limited expedited discovery to be appropriate so that the court and the parties would have a fuller evidentiary record for a preliminary injunction hearing); *KPM Analytics N. Am.,* 540 F. Supp. 3d 146 (granting request for expedited discovery, in part, to allow the court a more fulsome record to evaluate a request for a preliminary injunction and to design an equitable remedy to prevent irreparable harm while the case was being litigated). SP Plus seeks only very limited expedited discovery necessary to immediately evaluate and mitigate its actual and threatened irreparable harm and for preparation of its impending motion for a preliminary injunction, and it

plans to seek the remainder of discovery under the typical discovery process.

In short, an analysis of the above factors establishes that the requested expedited discovery related to Diniz's misconduct prior to an anticipated motion for preliminary injunctive relief and hearing is both reasonable and necessary.

## V. A Preservation Order is Appropriate and Not Unduly Burdensome to Diniz.

Furthermore, to ensure that all relevant evidence is preserved, SP Plus seeks a preservation order requiring Diniz not to destroy or alter any of the evidence pertaining to this matter. The preservation order would not burden Diniz and is appropriate under the circumstances – even absent a court order, parties to civil litigation may not destroy evidence. *See Lekkas v. Mitsubishi Motors Corp.*, 2002 WL 31163722, at *3 (N.D. Ill. Sept. 26, 2002); *see also Shutterfly, Inc.*, 2012 WL 2911887, at *3 ("Simply prohibiting the destruction of evidence will not burden defendants.").

## CONCLUSION

For the foregoing reasons, SP Plus respectfully requests that the Court grant its Motion for Expedited Discovery, a Preservation Order, and a Protective Order. A Proposed Order is submitted herewith for the Court's consideration and convenience.

Respectfully submitted,

SP PLUS LLC,

By its attorneys,

*/s/* Timothy D. Elliott
Timothy D. Elliott
  *telliott@rathjelaw.com*
RATHJE WOODWARD LLC
300 E. Roosevelt Road, Suite 220
Wheaton, Illinois 60187
Phone: (630) 510-4910
Fax: (630) 668-9218

Russell Beck, MA BBO No. 561031
  *rbeck@beckreed.com*
Stephen D. Riden, MA BBO No. 644451
  *sriden@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Phone: (617) 500-8660
Fax: (617) 500-8665

Dated: March 19, 2025    *Pro Hac Vice Application Forthcoming*